No. 24-1476

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

LEAH P. HOLLIS,

Plaintiff-Appellant,

v.

MORGAN STATE UNIVERSITY, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Maryland at Baltimore
Case No. 1:19-cv-03555, Hon. Lydia Kay Griggsby

## BRIEF FOR PLAINTIFF-APPELLANT LEAH P. HOLLIS

Viktor K. Dolberg
Annie Farrell
Zenia Grzebin
  Student Counsel

Aderson B. Francois
CIVIL RIGHTS CLINIC
GEORGETOWN UNIVERSITY LAW
  CENTER

Becca Steinberg
Brian Wolfman
Regina Wang
GEORGETOWN LAW APPELLATE
  COURTS IMMERSION CLINIC
600 New Jersey Ave., NW,
Suite 312
Washington, D.C. 20001
(202) 662-9549

Counsel for Plaintiff-Appellant Leah P. Hollis

October 11, 2024

# Table of Contents

Table of Authorities .................................................................. iii

Introduction ............................................................................. 1

Statement of Jurisdiction ......................................................... 2

Issues Presented ....................................................................... 2

Statement of the Case .............................................................. 2

I.    Factual background........................................................... 2

    A.   MSU hires Dr. Hollis as an assistant professor. ................. 2

    B.   MSU rejects Dr. Hollis's 2016 application for associate
        professor with tenure............................................................ 4

    C.   Dr. Hollis files an internal discrimination complaint and
        EEOC charge and is demoted to at-will status. ................. 8

    D.   The EEOC finds cause that Dr. Hollis's complaint has
        merit.................................................................................... 10

    E.   MSU rejects Dr. Hollis's 2019 full-professor application. ............. 11

    F.   MSU rejects Dr. Hollis's 2020 full-professor application. ............. 13

    G.   MSU paid and treated male professors differently than
        Dr. Hollis............................................................................ 14

II.   Procedural background.................................................... 17

Summary of Argument ............................................................ 18

Standard of Review ................................................................. 19

Argument ................................................................................ 20

I.    The district court erred in granting MSU summary judgment
    on Dr. Hollis's wage-discrimination claims. ........................ 20

    A.   Dr. Hollis established a prima facie case of wage
        discrimination. .................................................................. 20

    B.   MSU's reliance on sex-neutral factors do not "in fact"
        explain the pay disparities between Dr. Hollis and her
        male colleagues.................................................................. 22

II.     Summary judgment on Dr. Hollis's sex-discrimination claims
        should be reversed. ........................................................29

        A.     Dr. Hollis's 2019 sex-discrimination claims are timely. .................29

        B.     Dr. Hollis exhausted her 2020 sex-discrimination claims. .............31

        C.     MSU discriminated against Dr. Hollis based on sex when it
               failed to promote her to associate professor and full
               professor. .........................................................34

               1.     Dr. Hollis established a prima facie case of sex
                      discrimination. .............................................35

               2.     MSU's reasons for denying Dr. Hollis promotion are
                      pretextual. .................................................40

III.    The district court erred in granting MSU summary judgment
        on Dr. Hollis's retaliation claims. ............................................47

        A.     Dr. Hollis presented facts establishing a prima facie case of
               retaliation. ........................................................48

        B.     MSU's reasons for demoting Dr. Hollis are pretextual. .................51

IV.     Dr. Hollis established a Section 1983 claim. ................................54

Conclusion ................................................................................54

Request for Oral Argument ...............................................................

Certificate of Compliance ................................................................

Certificate of Service ....................................................................

# Table of Authorities

**Cases**                                                        **Page(s)**

*Adams v. Trs. of the Univ. of N.C.-Wilmington,*
  640 F.3d 550 (4th Cir. 2011) ................................................40, 46

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................20

*Anderson v. Westinghouse Savannah River Co.,*
  406 F.3d 248 (4th Cir. 2005) ................................................35, 46

*Ardrey v. UPS,*
  798 F.2d 679 (4th Cir. 1986) ......................................................39

*Arsham v. Mayor & City Council of Balt.,*
  85 F. Supp. 3d 841 (D. Md. 2015) ...............................................34

*Barreto v. SGT, Inc.,*
  826 Fed. Appx. 267 (4th Cir. 2020) ...............................................48

*Bostock v. Clayton Cnty.,*
  590 U.S. 644 (2020) ................................................................36

*Brewster v. Barnes,*
  788 F.2d 985 (4th Cir. 1986) ......................................................22

*Brinkley v. Harbour Recreation Club,*
  180 F.3d 598 (4th Cir. 1999) ......................................................39

*Brinkley-Obu v. Hughes Training, Inc.,*
  36 F.3d 336 (4th Cir. 1994) ...........................................20, 21, 22, 23

*Burlington N. & Santa Fe Ry. v. White,*
  548 U.S. 53 (2006) ..........................................................47, 48, 49

*Cannon v. Peck,*
  36 F.4th 547 (4th Cir. 2022) ......................................................30

*Carter v. Ball,*
    33 F.3d 450 (4th Cir. 1994)................................................38, 39, 50

*Causey v. Balog,*
    162 F.3d 795 (4th Cir. 1998)................................................54

*Chacko v. Patuxent Inst.,*
    429 F.3d 505 (4th Cir. 2005)................................................33

*Chisholm v. U.S. Postal Serv.,*
    665 F.2d 482 (4th Cir. 1981)................................................32

*Davis v. Piper Aircraft Corp.,*
    615 F.2d 606 (4th Cir. 1980)................................................31

*DeMasters v. Carilion Clinic,*
    796 F.3d 409 (4th Cir. 2015)................................................48, 49

*Dennis v. Columbia Colleton Med. Ctr., Inc.,*
    290 F.3d 639 (4th Cir. 2002)................................................36, 42, 43, 45, 46

*Duplan v. City of New York,*
    888 F.3d 612 (2d Cir. 2018)................................................34

*EEOC v. Md. Ins. Admin.,*
    879 F.3d 114 (4th Cir. 2018)................................................20, 21, 22

*EEOC v. Sears Roebuck & Co.,*
    243 F.3d 846 (4th Cir. 2001)................................................41, 42, 43

*Evans v. Int'l Paper Co.,*
    936 F.3d 183 (4th Cir. 2019)................................................19, 20

*Evans v. Techs. Applications & Serv. Co.,*
    80 F.3d 954 (4th Cir. 1996)................................................34, 35, 40

*Ford Motor Co. v. EEOC,*
    458 U.S. 219 (1982)................................................33

iv

*Ford v. Marion Cnty. Sheriff's Off.*,
  942 F.3d 839 (7th Cir. 2019)..................................................34

*Foster v. GeneDx, Inc.*,
  417 F. Supp. 3d 673 (D. Md. 2019) .....................................20

*Gillins v. Berkeley Elec. Coop.*,
  148 F.3d 413 (4th Cir. 1998)................................................19

*Glunt v. GES Exposition Servs., Inc.*,
  123 F. Supp. 2d 847 (D. Md. 2000) ......................................20

*Grattan v. Burnett*,
  710 F.2d 160 (4th Cir. 1983), *aff'd* 468 U.S. 42 (1984)...................30

*Haynes v. Waste Connections, Inc.*,
  922 F.3d 219 (4th Cir. 2019)................................................41

*Heiko v. Colombo Sav. Bank*,
  434 F.3d 249 (4th Cir. 2006)...........................................40, 46

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*,
  354 F.3d 277 (4th Cir. 2004)................................................43

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005)............................................................47

*Johnson v. City of Charlotte*,
  229 F. Supp. 2d 488 (W.D.N.C. 2002) .................................42

*Jones v. Calvert Grp.*,
  551 F.3d 297 (4th Cir. 2009)............................................33, 34

*Lettieri v. Equant Inc.*,
  478 F.3d 640 (4th Cir. 2007)............................................49, 50

*Love-Lane v. Martin*,
  355 F.3d 766 (4th Cir. 2004)................................................54

v

*Mawakana v. Bd. of Trs. of Univ. of the D.C.*,
  926 F.3d 859 (D.C. Cir. 2019) ..........................................................................47

*Miles v. Dell, Inc.*,
  429 F.3d 480 (4th Cir. 2005) .....................................................................38, 39

*National Railroad Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ........................................................................................33

*Nealon v. Stone*,
  950 F.2d 584 (4th Cir. 1992) ..........................................................................34

*Preston v. Virginia*,
  31 F.3d 203 (4th Cir. 1994) ............................................................................34

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ...........................................................................35, 41, 43

*Reid v. James Madison Univ.*,
  90 F.4th 311 (4th Cir. 2024) ...........................................................................48

*Robinson v. Priority Auto. Huntersville, Inc.*,
  70 F.4th 776 (4th Cir. 2023) ...........................................................................39

*Sempowich v. Tactile Sys. Tech., Inc.*,
  19 F.4th 643 (4th Cir. 2021) .................................................................49, 51, 52

*Sharif v. United Airlines, Inc.*,
  841 F.3d 199 (4th Cir. 2016) ..........................................................................42

*Silva v. Bowie State Univ.*,
  2006 WL 314470 (4th Cir. 2006) ....................................................................50

*Smith v. First Union Nat'l Bank*,
  202 F.3d 234 (4th Cir. 2000) ..........................................................................31

*Smith v. Univ. of N.C.*,
  632 F.2d 316 (4th Cir. 1980) .....................................................................46, 47

*Strothers v. City of Laurel,*
   895 F.3d 317 (4th Cir. 2018).................................................49

*Sydnor v. Fairfax Cnty.,*
   681 F.3d 591 (4th Cir. 2012)..................................31, 32, 33, 34

*Tex. Dept. of Cmty. Affs. v. Burdine,*
   450 U.S. 248 (1981)..............................................................46

*Univ. of Pa. v. EEOC,*
   493 U.S. 182 (1990)..............................................................47

*Westmoreland v. TWC Admin. LLC,*
   924 F.3d 718 (4th Cir. 2019)............................................35, 41

*Wilcox v. Lyons,*
   970 F.3d 452 (4th Cir. 2020)...............................................54

*Wilkins v. Montgomery,*
   751 F.3d 214 (4th Cir. 2014)...........................................29, 30

*Young v. Lehman,*
   748 F.2d 194 (4th Cir. 1985)..............................................40

## Statutes and Rule

20 U.S.C. § 1681...........................................................................47

28 U.S.C. § 1291.............................................................................2

28 U.S.C. § 1331.............................................................................2

28 U.S.C. § 1367.............................................................................2

29 U.S.C. § 206(d)(1)...............................................................20, 22

42 U.S.C § 2000e–5(f)(1)..............................................................29

42 U.S.C. § 2000e-2(a)(1)........................................................20, 34

*42* U.S.C. § 2000e-3(a) ............................................................47

42 U.S.C. § 2000e(b) ...............................................................43

Md. Code Ann., Lab. & Empl. § 3–304 ......................................20

Md. Code Ann., State Gov't § 20-606(a)(1) ...............................20

Md. Code Ann., State Gov't § 20-606(f) ....................................47

Fed. R. Civ. P. 15(c)(1)(B) ...............................................29, 30

**Other Authorities**

Bernard Becker Med. Libr., *Tools for Authors: What is the h index?*, https://beckerguides.wustl.edu/authors/hindex ...........................24

*Leah Hollis*, Penn State, https://pure.psu.edu/en/persons/leah-hollis/publications/ .............................................................16

Tom Pelton & Ivan Penn, *Davis quits as Bowie vice president Legal action mulled against official accused of lying about degrees*, The Balt. Sun (May 14, 1998) ........................................................16

## Introduction

For eight years, Morgan State University treated Dr. Leah Hollis worse than her male colleagues. Despite her credentials, expertise, and experience, MSU systematically paid her less than every man who occupied the same position. Likewise, when it came to promotions, MSU undervalued Dr. Hollis's qualifications while looking past the shortcomings of her male colleagues. When Dr. Hollis objected to MSU's discrimination, it punished her by removing her from the tenure track and demoting her to at-will status.

After enduring years of discrimination, Dr. Hollis filed an internal complaint and a charge with the EEOC. The EEOC found cause to believe that MSU had discriminated against Dr. Hollis, but MSU refused to participate in conciliation. Dr. Hollis then sued the University and several administrators, claiming wage discrimination, sex discrimination, and retaliation. The district court granted summary judgment to MSU on all of Dr. Hollis's claims.

The district court erred in four ways. First, a jury could find that MSU's proffered reasons for underpaying Dr. Hollis were pretext for discrimination. Second, the district court applied the wrong legal standards to exclude her sex-discrimination claims as untimely and unexhausted. Third, on the merits of those claims, a jury could find that Dr. Hollis suffered sex discrimination when MSU and its officials failed to promote her three times. Finally, a jury could hold MSU liable for retaliation by finding a causal

connection between Dr. Hollis's formal complaints of discrimination and MSU's adverse employment actions. This Court should reverse.

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. JA70. On April 26, 2024, the district court granted MSU's motion for summary judgment, disposing of all of Dr. Hollis's claims. JA14. Dr. Hollis filed a timely notice of appeal on May 23, 2024. This Court has jurisdiction under 28 U.S.C. § 1291.

## Issues Presented

Whether the district court erred in granting MSU summary judgment on Dr. Hollis's (**I**) wage-discrimination claims, (**II**) sex-discrimination claims, (**III**) retaliation claims, and (**IV**) Section 1983 equal-protection claim.

## Statement of the Case

### I.    Factual background

#### A. MSU hires Dr. Hollis as an assistant professor.

In 2013, Dr. Hollis applied to be a professor in MSU's Department of Advanced Studies, Leadership, and Policy. JA788. The job posting sought candidates with (1) a "specialization in community college education or higher education administration"; (2) "graduate level teaching experience," including competence in "guiding doctoral student research and dissertations"; and (3) a "track record of scholarly publications and successful grant writing." JA798.

2

Dr. Hollis possessed these qualifications. *See* JA788-96. First, she had served as an assistant dean at the university level, held academic leadership positions supervising faculty at a community college and a four-year university, and conducted research on community colleges. JA491-92, 790-92, 794. She also held certifications in four specialties of higher-education management from Harvard, Stanford, and Cornell. JA790, 895. Second, Dr. Hollis had ten years of doctoral-level teaching experience, chairing ten dissertation committees and serving on ten more. JA790. Third, Dr. Hollis had authored three books, with another in press, and three journal articles. JA788, 794. MSU offered, and Dr. Hollis accepted, a tenure-track assistant-professor position on a three-year contract. JA2106.

From the beginning, MSU underpaid Dr. Hollis on the basis of sex. MSU offered her a non-negotiable starting salary of $60,000. JA527, 2106. This salary was the lowest for an assistant professor on the departmental pay scale and well below what any of her male colleagues earned. JA831-33, 1449-54.

This salary disparity reflected broader hostility within the Department. Shortly after Dr. Hollis began teaching in 2014, the department chair, Dr. Glenda Prime, made derogatory comments about Dr. Hollis to a doctoral student. JA1412. Dr. Prime said she underpaid Dr. Hollis because Dr. Hollis was a "disgusting lesbian" who should "leave [her] campus very soon." JA1412. And, foreshadowing Dr. Hollis's future struggles, Dr. Prime declared that Dr. Hollis "is a reject lesbian who will never receive her tenure

while" Dr. Prime remained in charge. JA1412. Her "boys" would "get the crown jewel," Dr. Prime proclaimed, "not a foul mouth reject lesbian." JA1412.

### B. MSU rejects Dr. Hollis's 2016 application for associate professor with tenure.[1]

Dr. Hollis had a productive first year at MSU. She published two peer-reviewed articles, participated in three conferences, taught six classes, and mentored three dissertation students. *See* JA924, 1015, 1044, 2907. MSU's then-current Policies and Procedures on Appointment, Promotion, and Tenure (APT policy) required a departmental committee to review a packet summarizing Dr. Hollis's credentials and recommend whether Dr. Hollis's contract should be renewed for a second three-year term. JA197. Dr. Hollis submitted her first-year packet to Dr. Prime on April 9, 2015. JA916, 2692-93. Oddly, Dr. Prime never assembled a departmental committee to review Dr. Hollis's first-year packet. *See* JA2695.

Dr. Hollis's second year at MSU was similarly productive. While teaching, she published five peer-reviewed articles, one book, and one book chapter. JA2906-07. Dr. Hollis's productivity and community-college expertise was recognized when she received the Community College Leadership Program's "Faculty of the Year" award. JA2915.

---

[1] Promotions are designated in this brief by the year of application, not the year of decision.

While Dr. Hollis lived up to her contractual duties, MSU did not. Under Dr. Hollis's contract, MSU was obligated by the end of Dr. Hollis's second year to provide her "written notice" if it had decided not to renew her contract for a second three-year term. JA2106. Written notice was also required if her contract was renewed. JA198. And although MSU acknowledged twice that Dr. Hollis "should have" received a renewal letter, JA1930, she never received written notice of any kind by the end of her second year, JA904-05, 1930.

Dr. Hollis applied for associate professor with tenure in fall 2016, the start of her third year at MSU. JA2895, 2900. MSU kicked off its review of Dr. Hollis's tenure application that same semester. *See* JA2991-92.

Here's how the promotion and tenure review process was supposed to work. The APT policy required that Dr. Hollis's application be reviewed successively by (1) a departmental review committee, (2) the department chair, (3) a school review committee, (4) the dean, and (5) the vice president of academic affairs (i.e., the provost). JA206-09. These reviewers were supposed to assess whether Dr. Hollis "demonstrated substantial professional achievement" based on three criteria—teaching, research, and service—and recommend whether MSU should grant or deny her promotion. JA199-200, 210-14. For each criterion, reviewers would rank Dr. Hollis's performance as excellent, satisfactory, or unsatisfactory. *See, e.g.,* JA2991. The university president would then render the final tenure decision. JA209.

A departmental review committee first evaluated Dr. Hollis's application, and two of its three members recommended promotion. JA2991-92. Consistent with her earlier homophobic statements, Dr. Prime, the department chair, then recommended deferral. JA1132-33. But MSU quickly deviated from its own policy. Per the APT policy, the next step was for Dean Patricia Welch to appoint a school review committee to consider Dr. Hollis's application. JA208. Instead, Dean Welch followed Dr. Prime's lead and recommended deferral before a school review committee was given an opportunity to weigh in. JA2110-11. A school review committee rendered its recommendation to deny promotion five months later. JA2110-11.

At each level of review, Dr. Hollis received ratings of "excellent" and "satisfactory" in every category but research. JA1132-33, 2991-92, 1911-21, 2111. When applying for associate professor, candidates' research portfolios are primarily assessed based on their research since joining MSU. *See* JA2704; *see, e.g.*, JA1132, 1904. Even though Dr. Hollis had published seven peer-reviewed articles since her arrival, her reviewers criticized three because they were published in "pay-to-publish" journals and two because they were published in journals where she was on the editorial board. JA1133, 1911, 1915, 1917, 1920. That criticism was unexpected, considering Dr. Prime had encouraged Dr. Hollis to publish in "pay-to-publish" journals. JA639-40. MSU did not criticize Dr. Hollis's remaining two articles. *See* JA1879-80, 1882-85, 1887, 1889.

Provost Gibson made another error near the conclusion of Dr. Hollis's application review. On May 24, 2017, Provost Gibson notified Dr. Hollis that her application had been deferred. JA1139-40. Dr. Hollis filed an appeal the same day. JA1142. Then Provost Gibson wrongly told Dr. Hollis she could not appeal the recommendation until she received President David Wilson's decision, JA1142, even though the APT policy authorizes an applicant to immediately appeal a negative recommendation by the provost, JA215-18.

About eight months after MSU received Dr. Hollis's application, President Wilson finally informed Dr. Hollis on May 26, 2017, that her application had been denied. JA1144-46. He told her to re-apply in September 2017. JA1145.

On May 30, 2017, after she received President Wilson's decision, Dr. Hollis submitted a revised appeal of Provost Gibson's recommendation. JA1148-49. She alleged procedural errors in the review of her application and maintained that MSU had discriminated against her in pay and promotion. JA1148-49. But this appeal led nowhere: Provost Gibson responded with another letter, insisting that Dr. Hollis re-apply for tenure in fall 2018 (Dr. Hollis's fifth year). JA1925. Dr. Hollis again appealed to President Wilson on June 26, 2017, alleging errors in the promotion-review procedure and sex discrimination. JA1467-70.

### C. Dr. Hollis files an internal discrimination complaint and EEOC charge and is demoted to at-will status.

Concerned about the flawed review process of her 2016 tenure application, Dr. Hollis filed an internal Equal Employment Opportunity (EEO) complaint on September 8, 2017, alleging that she was subject to unequal pay and sex discrimination at MSU. JA1464. Dr. Hollis also filed a charge of discrimination with the EEOC later that month. JA1346-49.

On September 11, 2017, just three days after MSU received notice of her EEO complaint, a faculty appeals committee met to consider Dr. Hollis's appeal of her 2016 promotion decision, which had been collecting dust since May. JA1928. The committee found no violations in the review of Dr. Hollis's 2016 promotion application and recommended that President Wilson deny Dr. Hollis's appeal. JA1928.

Three months later, MSU made a seemingly unprecedented decision. President Wilson told Dr. Hollis in a December 12, 2017 letter that her 2016 application had been submitted late and was therefore void. JA1932. That same day, Provost Gibson sent Dr. Hollis a letter. JA1934-35. Surprisingly, Provost Gibson asserted that Dr. Hollis's employment contract had never been renewed. JA1935. Because of this supposed non-renewal, Provost Gibson said that Dr. Hollis had been required to submit her promotion and tenure application in her second year, not her third. JA1934-35. For this reason, Provost Gibson deemed Dr. Hollis's promotion application late. JA1934-35.

8

The news from President Wilson and Provost Gibson came as a shock to Dr. Hollis, considering that she had submitted her tenure application on time. After all, assistant professors renewed for a second three-year contract can submit tenure applications any time before their fifth year of employment, JA199, and MSU had been acting as though her contract had been renewed. For one, Dr. Hollis never received written notice that her contract wasn't being renewed. *See supra* at 5. At this point, Dr. Hollis was already teaching a fourth year of classes at MSU—that is, she was employed by MSU past the expiration of her initial three-year contract. JA1473, 1501.

And that's not all. More than a dozen people over a fifteen-month period had reviewed Dr. Hollis's application, both initially and on appeal, without even a hint that her application was late. JA1140, 1145-46, 1879-80, 1882-85, 1887, 1889, 1928-30. Quite the contrary, one departmental committee member recommended that Dr. Hollis take "the remaining three years" she had at MSU to work on her research. JA1884. The appeals committee also found that because Dr. Hollis "continue[d] to be employed as an Assistant Professor," it was "immaterial" that she did not receive a reappointment letter for a second three-year term. JA1930. It therefore treated Dr. Hollis like any other MSU employee with a renewed contract, saying she was "eligible to apply for promotion and tenure" by her fifth year. JA1929. All told, President Wilson's out-of-the-blue rejection of Dr. Hollis's application for lateness was, charitably put, inconsistent with MSU's other business-as-usual behavior.

Nevertheless, MSU was suddenly steadfast in declaring that it had never renewed Dr. Hollis's contract. Provost Gibson falsely claimed that Dr. Hollis never submitted her first-year packet that was prerequisite to renewal of her contract. JA1935. So, in addition to rejecting her tenure application for its supposed tardiness, MSU demoted Dr. Hollis from a tenure-track assistant professor to an at-will employee. JA1935. MSU leadership cannot recall any other tenure-track professor being demoted to at-will status. JA441.

### D. The EEOC finds cause that Dr. Hollis's complaint has merit.

While Dr. Hollis's EEOC charge was pending, in fall 2018, she applied again for promotion to associate professor with tenure. *See* JA1941-42. The review committees recommended tenure and promotion. JA1942, 1961-62. But Dr. Prime, the department chair, recommended denying tenure. JA1958-59, 1972. Dr. Hollis's tenure application remained pending for several months until spring 2019. *See* JA1982.

Meanwhile, the EEOC released its findings. JA1463-65. It found "reasonable cause to believe [MSU] discriminated against [Dr. Hollis] and subjected her to unequal pay because of her sex." JA1464. It found as well "reasonable cause to believe that [MSU] subjected [Dr. Hollis] to unlawful retaliation" by denying her promotion with tenure, forcing her to resubmit her first-year packet, threatening to terminate her, refusing to investigate her EEO complaint, and converting her to an at-will employee for engaging in protected activity. JA1464.

The EEOC sought to engage Dr. Hollis and MSU in conciliation. JA1464. MSU did not participate. *See* JA1518, 1520. Instead, on May 6, 2019, MSU promoted Dr. Hollis to associate professor with tenure and a $66,619 salary. JA1452, 1982.

Two days later, MSU asked the EEOC to reconsider its determination in light of Dr. Hollis's promotion. JA1519-21. MSU also disputed the EEOC's finding that Dr. Hollis had been paid unequally because of her sex. JA1520. The EEOC did not reconsider its findings, *see* JA1517-18, and MSU informed the EEOC that it would not participate in conciliation, JA1517.

### E. MSU rejects Dr. Hollis's 2019 full-professor application.

Dr. Hollis continued to excel as a scholar and instructor. In 2019 alone, she received over $16,000 in grants and chaired four dissertations to completion. JA2812, 2822. One of the dissertations she chaired was awarded "Dissertation of the Year." JA2811. She also published four peer-reviewed journal articles and a book chapter. JA2806, 2810. These credentials should have set Dr. Hollis up for success, given that full-professor candidates are assessed on work beyond what was submitted in their tenure application, as MSU acknowledges. *See* JA773-74; D. Ct. ECF 87 at 6; *see e.g.*, JA2298-99.

Some promotion decision-makers took positive note of these credentials when, in 2019, Dr. Hollis applied for full professor, a position that required Dr. Hollis to attain "recognition as an outstanding scholar and instructor." JA200. The departmental review committee, which along with the

department chair, had primary responsibility for assessing candidates' service, JA213-14, rated her service as "satisfactory," JA1984. Because the APT policy notes that the "quantity of quality dissertations … supervised by an Applicant is pertinent to evaluating" an applicant's teaching, JA211, Dr. Hollis was "applauded for the large number of dissertations she chaired," JA1984. The APT policy also lists grants and articles in peer-reviewed journals as relevant to evaluating an applicant's research. JA211-13. Accordingly, some reviewers positively noted Dr. Hollis's grant activity and large number of peer-reviewed journal articles. *See, e.g.*, JA1993.

But among those that complimented Dr. Hollis's research, one decision-maker evaluated her on explicitly gendered terms: A school committee member noted that Dr. Hollis's h-index score (which considers how often an author's work is cited) was lower than those of *female full* professors in his discipline, even though the same reviewer compared male applicants' h-indexes to those of *male associate* professors. JA2002, 2163, 2605.

Some promotion decision-makers looked at Dr. Hollis's teaching credentials negatively. *See, e*.g., JA2008-09, 2024. For example, Dr. Prime, who had already exhibited bias toward Dr. Hollis, *see supra* at 3-4, refused to recognize two of Dr. Hollis's favorable peer-teaching reviews because they pre-dated her tenure. JA2021, 2024. In contrast, Dr. Prime considered pre-tenure peer-teaching reviews when evaluating male candidates. JA2320.

Dr. Hollis's detractors won out. The departmental review committee, school review committee, and Dr. Prime (now the dean) recommended

12

rejecting Dr. Hollis's promotion. JA1984, 1995, 2025-26. President Wilson ultimately informed Dr. Hollis that her promotion application had been denied. JA1237. Dr. C. Sean Robinson, a department colleague, wrote to Dr. Hollis when he heard her news: "I am so sorry. I know how hard you have worked and how robust of a portfolio you have. It truly makes no sense … I can only guess it's politics at play—race, gender, all of that … ." JA1523.

Dr. Hollis then filed a second charge with the EEOC on June 16, 2020. JA1362-65.

### F.  MSU rejects Dr. Hollis's 2020 full-professor application.

Dr. Hollis gave advancement at MSU one last shot. In fall 2020, Dr. Hollis submitted a second application for full professor. JA2839, 2849. At this point, she had published one book chapter and twelve peer-reviewed journal articles since 2019, with two more articles pending. JA2864-65, 2869. During the same timeframe, she had received over $75,000 in grants and chaired eight dissertations to completion. JA2871, 2881-82.

But the faculty members reviewing Dr. Hollis's application were not impressed. Dr. Hollis received an "unsatisfactory" research rating from the school review committee. JA2040. Several reviewers failed to credit Dr. Hollis for her in-progress scholarship, even though reviewers regularly credited male applicants for theirs. *Compare* JA2049, 2057, 2069, *with* JA2160, 2585, 2598, 2601-02. And at least one reviewer continued to explicitly

13

incorporate gender into the review, comparing Dr. Hollis's h-index to female associate-professor h-indexes. JA2054.

Again, the departmental review committee, school review committee, and Dean Prime recommended against promoting Dr. Hollis. JA2032, 2040, 2071. Dr. Hollis was denied promotion along with Dr. Dia Sekayi, another female professor in the Department. JA1877. Dr. Krishna Bista and Dr. Uttam Gaulee, two male professors, were promoted. JA1877.

But Dr. Hollis did not let the disappointment of a third promotion denial prevent her from delivering high-quality instruction and scholarship. In 2022, she received the Dr. Iva G. Jones Medallion Emblem from MSU for excellence in teaching, scholarship, service, leadership, and character. JA1487. This award is the "highest honor" for faculty at MSU, and Dr. Hollis was the first professor from the School of Education to receive the award. JA1487.

And, eventually, a different university recognized her talents with an appropriate faculty position. Today, Dr. Hollis is a full professor with tenure at Pennsylvania State University. JA1527. She also serves on the dean's leadership team as Associate Dean for Access, Equity and Inclusion. JA1527.

### G. MSU paid and treated male professors differently than Dr. Hollis.

Throughout Dr. Hollis's time there, MSU paid comparably situated male professors substantially more than it paid Dr. Hollis. Though Dr. Hollis's starting salary as an assistant professor was $60,000, MSU paid male

assistant professors in her department starting salaries ranging from $65,000-$70,000. JA1449, 1451-54. As Dr. Hollis moved up the ladder, the pay gap persisted. Starting as an associate professor, she earned $66,619. JA1452. Male associate professors' starting salaries ranged from $70,631-$80,000. JA1451, 1453-54, 1456-57. These pay disparities persisted even though Dr. Hollis requested a salary adjustment to make her pay commensurate with her male peers'. JA1460-61.

In addition to paying male professors more, MSU gave them the same promotions that it denied Dr. Hollis. But these professors' qualifications were no better than Dr. Hollis's.

For instance, Dr. Gaulee had little community-college experience and few publications. Before coming to MSU, he taught a course on community colleges at a four-year university. JA1294, 2207. While an MSU assistant professor, he authored only two "unaffiliated, nonpay-to-publish," peer-reviewed journal articles and zero books. JA1451, 2201-02, 2715-16. During Dr. Gaulee's promotion evaluations, his reviewers noted that he had low-quality publications, a small number of citations, a low number of peer-reviewed journal articles, and that many of his works were published on his own forum. JA2144, 2164-65, 2169, 2180-82. Nonetheless, MSU promoted Dr. Gaulee twice: first to associate professor in the 2018 cycle and then to full professor in the 2020 cycle. JA1872, 1877. Not only that, MSU paid him more than Dr. Hollis every step of the way. *Compare* JA1451, *with* JA1452.

15

Dr. Russell Davis, another male colleague, was also treated better than Dr. Hollis. Before coming to MSU, Dr. Davis had only a "small number of co-authored publications," two of which Dr. Hollis co-authored. JA1336; *see* 1347, 1481.[2] Dr. Davis also had prior experience as a community-college president. JA1293. But when MSU hired him, it was public knowledge that Dr. Davis had falsified his credentials to get leadership positions. JA1336.[3] Nonetheless, MSU paid him more than Dr. Hollis. *Compare* JA1449, *with* JA1452.

MSU also favored Dr. Robinson. Before coming to MSU, he had significant higher-education scholarship, teaching, and leadership experience. JA1297-98. When hired, Dr. Robinson had published six book chapters, three articles in peer-reviewed journals, and twenty conference papers. JA1344, 2334-39. But once he got to MSU, Dr. Robinson's scholarly productivity slowed. Between receiving tenure in 2014 and applying for full professor, Dr. Robinson published zero books and only one journal article, and he received little grant money. JA2332, 2336, 2779, 2781, 2785. Further, he did not publish any scholarship in the year he sought full professorship. JA2334-36. And he chaired only six dissertations since receiving tenure.

---

[2] *See Leah Hollis*, Penn State, https://pure.psu.edu/en/persons/leah-hollis/publications/ (last visited Oct. 11, 2024).

[3] Tom Pelton & Ivan Penn, *Davis quits as Bowie vice president Legal action mulled against official accused of lying about degrees*, The Balt. Sun (May 14, 1998), https://www.baltimoresun.com/news/bs-xpm-1998-05-14-1998134018-story.html.

JA2341. Regardless, MSU rewarded Dr. Robinson by promoting him to full professor and paying him more than Dr. Hollis. JA1452, 1455-56, 1875.

## II.    Procedural background

In September 2019, Dr. Hollis received a right-to-sue notice for her September 2017 EEOC charge. JA1358. She then sued MSU and several administrators (collectively "MSU") based on the discrimination, retaliation, and unequal pay that she had endured. JA16-52. On February 9, 2021, Dr. Hollis received a right-to-sue notice based on her second EEOC charge. JA1367. With leave of court, she amended her lawsuit to include sex-discrimination claims based on her 2019 and 2020 non-promotions to full professor. JA66-110. In addition to claims against the University, her amended complaint alleged a Section 1983 claim against individual defendants Wilson, Gibson, Prime, and Crumpton-Young (Gibson's successor as provost) for denying her 2016, 2019, and 2020 promotions. JA104-05.[4]

The district court granted MSU summary judgment on all claims. JA189. It found that (1) "the pay disparity in this case was due to factors other than gender;" (2) the sex-discrimination claims based on Dr. Hollis's 2019 promotion application were untimely; (3) the sex-discrimination claims based on her 2020 promotion application were unexhausted because no

---

[4] Dr. Hollis also pleaded Family and Medical Leave Act claims against Drs. Myrtle Dorsey and Carolyn Anderson. JA108. She is no longer pursuing these claims.

EEOC charge had been filed for those specific claims; (4) Dr. Hollis's evidence was insufficient to establish sex discrimination based on her 2016 promotion application; and (5) Dr. Hollis's retaliation claim failed because she could not show that MSU "acted with any retaliatory motive, intent, or animus." JA175-78.

## Summary of Argument

**I.** The district court erred in granting MSU summary judgment on Dr. Hollis's wage-discrimination claims. Dr. Hollis established a prima facie case of wage discrimination by showing that MSU paid her less than every male professor in her department. MSU's proffered justifications do not explain the pay disparities because Dr. Hollis had at least the same quality of publications and credentials as the men who MSU paid more.

**II.** The district court erred in granting summary judgment to MSU on Dr. Hollis's sex-discrimination claims based on her 2016, 2019, and 2020 promotion applications. Her claims based on the 2019 promotion application were timely pleaded in the amended complaint because they relate back to the original complaint. Her claims based on the 2020 promotion application were exhausted because they are reasonably related to Dr. Hollis's two EEOC charges. On the merits, summary judgment should be reversed because Dr. Hollis raised genuine fact disputes as to (1) whether she established an inference of discrimination and (2) whether MSU's reasons for denying her three promotions are pretextual.

18

**III.** The district court erred in granting summary judgment to MSU on Dr. Hollis's retaliation claims. MSU retaliated against Dr. Hollis by demoting her to at-will status just three months after she filed her internal EEO complaint. MSU's rejection of Dr. Hollis's long-pending promotion application in the intervening period between the EEO complaint is further evidence of retaliation. MSU's asserted justification that Dr. Hollis was demoted because she failed to submit her first-year packet is plainly false. MSU's other excuse—that it rejected her 2016 promotion application because it was late—is both false and inconsistent with over a dozen evaluations by MSU that did not consider the application late.

**IV.** The district court erred in granting summary judgment to MSU on Dr. Hollis's Section 1983 claim. Sex discrimination by persons acting under color of state law violates the Fourteenth Amendment's Equal Protection Clause and is analyzed under the Title VII framework. Because Dr. Hollis has sufficiently demonstrated that her Title VII claim survives summary judgment, she also has done so for her Section 1983 claim.

## Standard of Review

This Court reviews a district court's grant of summary judgment de novo. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 191 (4th Cir. 2019). "[A]ny permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion," here, Dr. Hollis. *Gillins v. Berkeley Elec. Coop.*, 148 F.3d 413, 415 (4th Cir. 1998). If Dr. Hollis "show[s]

that there is a genuine issue for trial," this Court should reverse. *Evans*, 936 F.3d at 191 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Argument

## I.    The district court erred in granting MSU summary judgment on Dr. Hollis's wage-discrimination claims.

The Equal Pay Act (EPA), Title VII, and their Maryland state-law analogues prohibit employers from paying men and women differently when they perform equal work. 29 U.S.C. § 206(d)(1); 42 U.S.C. § 2000e-2(a)(1). MSU did exactly that by systematically paying Dr. Hollis less than male assistant and associate professors in her department.[5]

### A. Dr. Hollis established a prima facie case of wage discrimination.

To make out an EPA claim, the plaintiff must first establish a prima facie case of wage discrimination. *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018). Under the EPA, the prima facie case has three elements: (1) the employer paid higher wages to an employee of the opposite sex; (2) the comparator performed "equal work on jobs requiring equal skill, effort, and

---

[5] The analysis under the Maryland Equal Pay for Equal Work Act, Md. Code Ann., Lab. & Empl. § 3–304, and the Maryland Fair Employment Practices Act (MFEPA), Md. Code Ann., State Gov't § 20-606(a)(1), track the analyses under the EPA and Title VII, respectively. *Compare Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994), *with Glunt v. GES Exposition Servs., Inc.*, 123 F. Supp. 2d 847, 861-62 (D. Md. 2000), *and Foster v. GeneDx, Inc.*, 417 F. Supp. 3d 673, 688-89 (D. Md. 2019). Thus, if this Court reverses on the federal claims, it should reverse on the analogous state-law claims as well.

20

responsibility"; and (3) the comparator performed the equal work under "similar working conditions." *Id.* at 203. Under Title VII, the prima facie wage-discrimination elements are similar: (1) the plaintiff is a member of a protected class; (2) the plaintiff was paid less than an employee outside the class; and (3) the plaintiff's job was similar to the higher-paid job. *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994).

The district court correctly found that Dr. Hollis made out a prima facie case of wage discrimination, which MSU did not dispute below. *See* JA183; D. Ct. ECF 87 at 56. First, MSU paid higher starting salaries to male professors. Dr. Hollis's starting assistant-professor salary ($60,000) was well below those of her male colleagues, Dr. Davis ($65,000) and Dr. Gaulee ($65,000). JA1449, 1451-52. In fact, MSU paid Dr. Hollis less than *all* male assistant professors in her department, whose starting salaries ranged from $65,000 to $70,000. JA1449, 1451, 1453-54. Similarly, when Dr. Hollis was promoted to associate professor, her starting salary of $66,619 was lower than the starting associate-professor salaries of Dr. Gaulee ($70,631) and Dr. Robinson ($80,000). JA1451-52, 1456. Mirroring her situation as an assistant professor, Dr. Hollis's starting salary was less than that of every male associate professor in her department, whose starting salaries ranged from $70,000 to $80,000. JA1451, 1453, 1456-57.

Because MSU paid Dr. Hollis less to begin with, her pay remained lower than male assistant and associate professors in the Department throughout her eight years at MSU. JA1447-58. This pattern persisted even after

Dr. Hollis requested that her salary be adjusted to match other assistant and associate professors in her department. JA1460-61.

Second, Dr. Hollis performed work equal to her male colleagues. All assistant and associate professors perform a "common core of tasks," including teaching, research, and service. *Brinkley-Obu*, 36 F.3d at 351; *see* JA210-14, 2672.

Third, Dr. Hollis and her male colleagues shared similar working conditions. All worked in the same department at MSU. *See Md. Ins. Admin.*, 879 F.3d at 118, 121.

### B. MSU's reliance on sex-neutral factors do not "in fact" explain the pay disparities between Dr. Hollis and her male colleagues.

After the plaintiff establishes a prima facie case of wage discrimination under the EPA, an employer then must show that one of four statutory defenses justifies the pay disparity: (1) "a seniority system," (2) "a merit system," (3) "a system that measures earnings by quantity or quality of production," or (4) "any other factor other than sex." 29 U.S.C. § 206(d)(1). The burden on MSU of proving these defenses is a "heavy one." *Brewster v. Barnes*, 788 F.2d 985, 992 (4th Cir. 1986). At summary judgment, the non-sex-based consideration must "*in fact* explain the wage disparity." *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 121 (4th Cir. 2018). In other words, MSU cannot carry its burden by showing only that the factor "*could* explain or *may* explain" the gap. *Id.* at 123. Similarly, under Title VII, the plaintiff must show that a jury could find that the employer's non-discriminatory reason for the

wage disparity is pretext for discrimination. *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 344 (4th Cir. 1994).

MSU has proffered two factors other than sex seeking to justify why it paid Dr. Hollis less than her male colleagues: (1) the quality of Dr. Hollis's publication record, and (2) her colleagues' supposedly superior qualifications. D. Ct. ECF 87 at 53-56. Both are pretext for discrimination that do not "in fact" explain the systematic wage gaps.

**Publication record.** A reasonable jury could find that Dr. Hollis's publication record does not "in fact" explain the pay disparities. Dr. Hollis's publication record has all the objective indicia of high-quality scholarship: (1) a large number of citations, (2) a high h-index, (3) productivity, and (4) scholarly recognition. MSU overlooked and minimized these attributes when evaluating Dr. Hollis, but it praised male professors for them though they were no more deserving than she was.

First, Dr. Hollis's work garnered a large number of citations throughout her time at MSU. JA1993 (492 in 2019), 2062 (664 in 2020), 1474 (1,025 in 2022). MSU regularly considered a faculty member's citation quantity when it reviewed promotion candidates. *See* JA2144, 2594, 2600. For example, when evaluating Dr. Gaulee, the review committee noted that he did not have "an impressive total number of citations." JA2144. Still, MSU paid him more than Dr. Hollis. JA1451-52.

Second, Dr. Hollis also had a high h-index while at MSU. JA2002 (14 in 2019), 2062 (16 in 2020), 1474 (19 in 2022).[6] MSU considered h-indexes when evaluating professors. *See, e.g.*, JA2144, 2163, 2290, 2607. When assessing Dr. Gaulee's 2020 full-professor application, a member of the review committee noted that Dr. Gaulee's h-index of 5 was "lower than the average for associate professors … in my field." JA2164. Nonetheless, MSU paid him more than Dr. Hollis. JA1451-52.

Third, Dr. Hollis was one of the most productive scholars at MSU. When hired, Dr. Hollis had published three books and three articles and had one book in press. JA794. While at MSU, Dr. Hollis published three more books and thirty-six more peer-reviewed journal articles. JA1474-79. In 2017, Dr. Hollis published 25% of the publications noted in the dean's annual department report. JA1923. Yet, MSU did not value Dr. Hollis's scholarly productivity. Instead, MSU claimed that quality was what mattered. JA1132-33, 2032-33, 2047.

It would not be irrational to value scholarly quality over quantity. But it's not at all clear that MSU did. Instead, it considered male professors' publication quantity alone to be a positive. Dr. Prime, the department chair,

---

[6] The h-index is an objective measure of the importance, significance, and impact of a scholar's body of research. *See* Bernard Becker Med. Libr., *Tools for Authors: What is the h index?*, https://beckerguides.wustl.edu/authors/hindex. For example, Dr. Hollis's 2022 h-index was 19, meaning that she had at least 19 publications that had been cited over 19 times. JA1474.

typically noted male professors' number of publications alone when justifying salary decisions, without mentioning their quality. *See, e.g.*, JA1341 ("[Dr. Bista] has a strong publication record including the following: 3 edited volumes, 3 book chapters and 15 peer-reviewed journal articles … "); JA1298 ("Dr. Robinson … had [published] … six book chapters, three articles in refereed journals, and about twenty referre[e]d and invited conference papers."). But when it came to Dr. Hollis, Dr. Prime conducted a "closer analysis" and discredited her scholarly output. JA1132.

Fourth, MSU awarded Dr. Hollis its highest honor, the Dr. Iva G. Jones Medallion Emblem, making her the first professor in the School of Education to receive it. JA1487. The award is, in part, based on the quality of the recipient's scholarship. JA1515. MSU thought that Dr. Hollis's scholarly contributions warranted a prestigious honor. But MSU discounted this same scholarship when setting her pay.

Not only did MSU overlook the positive attributes of Dr. Hollis's publication record, it held Dr. Hollis to a double standard when it came to self-publishing and publishing in pay-to-publish presses. Though MSU criticized Dr. Hollis for these kinds of publications, it ignored these purported deficiencies in men—and sometimes even praised them for doing the same thing. For example, Dr. Gaulee created his own journal, named himself the editor, and used it to publish his own work. JA2180, 2182. For doing so, the review committee said that he showed great promise and "initiative." JA2180. Dr. Hollis did something similar by creating her own

25

publishing company and releasing some of her scholarship through it. JA791, 1990. But MSU reviewers found it "perturbing" to see Dr. Hollis's self-published scholarship on her promotion applications, adding that they were "problematic and questionable." JA1991, 2040.

MSU did not offer these quality-based critiques when Dr. Hollis's male collaborators put forth the same publications. When Dr. Davis applied for an assistant-professor position at MSU, he had only "a small number of co-authored publications," two of which were published with Dr. Hollis. JA1336, 1347, 1481; *see supra* at 15-16. For Dr. Hollis, her publications were a negative: MSU invoked them to justify her bottom-of-the-scale salary. *See* JA336-37, 1133. But when it came to Dr. Davis, these same publications were a positive sign that he had "begun to make progress" on his publication record and could be paid $5,000 more than Dr. Hollis (his collaborator), despite lacking a "strong research portfolio." JA1336; *compare* JA1449, *with* JA1452.

In sum, a reasonable jury could find that Dr. Hollis's publication record was at least as strong as her male colleagues'. The quality of Dr. Hollis's record does not "in fact" explain MSU's decision to systematically underpay her.

**Colleagues' qualifications.** MSU also maintained that male professors' qualifications explain the disparities between their and Dr. Hollis's salaries. *See* JA1292-1300. A jury could find that this reason does not "in fact" explain

the gaps in earnings because Dr. Hollis possessed the qualifications that MSU claimed she lacked.

First, MSU said that it awarded Drs. Gaulee and Davis higher salaries because they had community-college experience. JA1292-94. MSU reasoned that Dr. Gaulee taught a class about community colleges at the University of Florida, and he participated in some community-college organizations. JA1294, 2207. Given Dr. Davis's weak publication record, the *only* reason MSU invoked for his higher pay was his experience as a community-college president, even though it was well known by the time Dr. Davis applied to MSU that he had falsified his credentials to get past leadership positions. JA1292-93, 1304.

Dr. Hollis also had community-college experience, but MSU ignored it. By the time MSU had hired her, Dr. Hollis had already conducted research on community colleges at Strayer University, and she served in a leadership position at the Community College of Philadelphia. JA491-92, 791-92. While at MSU, Dr. Hollis was named Faculty of the Year for her work in the Community College Leadership Program. JA1488.

Second, MSU said it paid Drs. Robinson and Davis higher salaries because of their higher-education administration experience and degrees. Dr. Robinson held a Ph.D in Higher Education Leadership & Policy Analysis and had several years in academic leadership and student affairs. JA2329-31. He also had taught several courses specifically focusing on higher education administration. JA1319. Dr. Davis held an Ed.D in Higher Education and

Community College Leadership. JA1308. As noted (at 16), he also had higher-education leadership experience, at least some of which he obtained through fraud.

A reasonable jury could find that Dr. Hollis's administration experience was at least equivalent. Dr. Hollis held an Ed.D in Administration, Training, and Policy Studies as well as several certifications in higher education from Harvard, Stanford, and Cornell. JA790, 895. Like Dr. Robinson, Dr. Hollis had taught several courses on higher-education administration at her previous university. JA790. Dr. Hollis also had almost two decades of higher-education teaching and leadership experience. JA790-94.

Finally, MSU said that it paid Dr. Robinson a higher salary because of his experience chairing dissertations. JA1298. When Dr. Robinson was hired as an associate professor, he had chaired fifteen dissertations at previous universities. JA1343. By the time Dr. Hollis was promoted to associate professor, she had chaired nineteen dissertations and was in the process of chairing an additional three. JA1483-85.

In sum, a jury could find that no meaningful differences between Dr. Hollis's qualifications and those of her male colleagues justified paying her less than every male professor in her department. This Court should reverse the district court's grant of summary judgment on Dr. Hollis's wage-discrimination claims.

II.    **Summary judgment on Dr. Hollis's sex-discrimination claims should be reversed.**

The district court erred repeatedly in granting MSU summary judgment on Dr. Hollis's sex-discrimination claims. First, it mistakenly rejected Dr. Hollis's 2019 claims as untimely, even though these claims relate back to her original district-court complaint. Second, it should have found that Dr. Hollis's 2020 claims were exhausted because they are reasonably related to Dr. Hollis's two EEOC charges. On the merits, Dr. Hollis raised genuine and material fact disputes regarding her sex-discrimination claims based on her 2016 application (which MSU does not argue is procedurally barred), as well as her 2019 and 2020 applications.

### A. Dr. Hollis's 2019 sex-discrimination claims are timely.

On June 29, 2021, Dr. Hollis amended her complaint to include claims based on the denial of her 2019 promotion application. JA8, 92-94. The district court found the claims untimely based on the ninety-day limitations period for filing a Title VII suit. JA178 (citing 42 U.S.C § 2000e–5(f)(1)). But Dr. Hollis was amending a lawsuit, not filing one, so the question is whether her amended complaint relates back to the original complaint under Federal Rule of Civil Procedure 15(c)(1)(B). *See Wilkins v. Montgomery*, 751 F.3d 214, 223-24 (4th Cir. 2014). As we now explain, Dr. Hollis's amended sex-discrimination claims concerning the 2019 denial of her promotion were timely because they relate back to her original federal-court complaint.

The relation-back doctrine renders timely amendments that "arose out of the conduct, transaction, or occurrence set out … in the original pleading." Fed. R. Civ. P. 15(c)(1)(B); *see Wilkins*, 751 F.3d at 223-24. A plaintiff seeking a relation-back finding must first show "some factual nexus" between the original and amended complaints. *Grattan v. Burnett*, 710 F.2d 160, 163 (4th Cir. 1983), *aff'd* 468 U.S. 42 (1984). With that hurdle cleared, "an amended claim is liberally construed to relate back to the original complaint if the defendant had notice of the claim and will not be prejudiced by the amendment." *Id.*; *see Cannon v. Peck*, 36 F.4th 547, 576 (4th Cir. 2022).

The original and amended complaints here share a factual nexus. Dr. Hollis's 2016 and 2019 sex-discrimination claims arise out of events surrounding MSU's denials of promotions to Dr. Hollis. *Compare* JA26-31, 40-41, 45-46, *with* JA92-94, 97-99, 103-04. Though the 2016 and 2019 promotion applications are discrete acts, they include the same employees, department, and university engaging in the same discriminatory conduct. *Compare* JA26-31, 40-41, 45-46, *with* JA92-94, 97-99, 103-04.

And MSU was on notice of Dr. Hollis's amended claims because she filed them with the EEOC. JA1362-63. When a charge is filed with the EEOC, "top administrators" are "bound to have known of them." *Grattan*, 710 F.2d at 163. Moreover, existing "Title VII proceedings … put defendants on notice of the possibility that [plaintiffs] might bring" additional related claims. *Id.* Dr. Hollis also described the ongoing 2019 promotion consideration in her

original complaint, explicitly putting MSU on notice that she might bring additional claims related to the 2019 promotion process. JA38.

Finally, relation back would not prejudice MSU. Dr. Hollis amended her complaint 140 days after receiving her right-to-sue notice. JA8, 1367. MSU has not pointed to "any specifically resulting prejudice," and "[d]elay alone" is not enough. *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980).

### B. Dr. Hollis exhausted her 2020 sex-discrimination claims.

Dr. Hollis's amended complaint added claims based on the denial of her 2020 application for full professor that occurred after Dr. Hollis filed her second EEOC charge. *See* JA94-95. The district court incorrectly concluded that these claims had not been exhausted before the EEOC. JA176-78.

"The touchstone for exhaustion is whether plaintiff's administrative and judicial claims are 'reasonably related.'" *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 595 (4th Cir. 2012) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000)). Dr. Hollis's 2020 claims meet this standard. Judicial claims are "reasonably related" to those described in an EEOC charge when they "can be expected to follow from a reasonable administrative investigation" of the original claims. *Id.* at 594 (quoting *Smith*, 202 F.3d at 247). The claims are reasonably related when, for example, the EEOC charge alleges discrimination in one part of a promotion process and the subsequent judicial claims allege discrimination in a different part of the same process, or when the judicial claims concern the same type of discriminatory conduct

31

as alleged in the EEOC charge. *See Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981); *Sydnor*, 681 F.3d at 595.

Dr. Hollis's 2020 sex-discrimination claims are reasonably related to the claims in her EEOC charges. In *Sydnor*, the judicial complaint was reasonably related to the EEOC charge when the plaintiff's claims involved the same place of work, actors, and type of discrimination raised in the charge. 681 F.3d at 595. The same is true here. The first and second EEOC charges alleged sex discrimination at the hands of MSU and its administrative leadership in the promotion process for Dr. Hollis in 2016 and 2019. JA1346-49, 1362-63. The amended judicial complaint alleges that the same type of discrimination, at the same workplace, by the same actors occurred again in 2020. *See* JA94-95.

The judicial claims are also reasonably related because the ongoing investigation into Dr. Hollis's second EEOC charge could have been expected to uncover the related sex-discrimination claims from Dr. Hollis's 2020 application. *See Sydnor*, 681 F.3d at 594. After all, the 2020 application was pending for months while the EEOC investigation continued. *See* JA1242, 1367. It is no defense, as MSU argued below, that the final decision on the 2020 application occurred after the EEOC finished its investigation. D. Ct. ECF 102 at 20. If it is reasonably related to the administrative claim, a judicial claim is exhausted even if the discrete act giving rise to it—in this case, MSU's denial of the 2020 application—occurs after the EEOC

32

investigation is completed. *See Jones v. Calvert Grp.*, 551 F.3d 297, 302 (4th Cir. 2009).

That is so because requiring plaintiffs to file successive EEOC charges would force them into a perpetual and costly loop—stuck between administrative and judicial proceedings—that rewards defendants for continuing their discriminatory acts. "[S]ending [Dr. Hollis] back to square one … hardly serves the 'purposes of notice and conciliation,'" the twin rationales for exhaustion. *Sydnor*, 681 F.3d at 597 (quoting *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005)). Perversely, requiring Dr. Hollis to file successive EEOC charges would do precisely what Title VII seeks to prevent: forcing Dr. Hollis to wait even longer before seeking justice for related acts of discrimination. *See Ford Motor Co. v. EEOC,* 458 U.S. 219, 228 (1982).

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), does not suggest otherwise. *Contra* JA177. It held that a plaintiff cannot use the relation-back doctrine to assert claims that are outside of Title VII's statutory limitations period. *Morgan*, 536 U.S. at 105. But "*Morgan* addresses only the issue of when the limitations clock for filing an EEOC charge begins ticking." *Jones*, 551 F.3d at 303. It "does not purport to address the extent to which an EEOC charge satisfies exhaustion requirements for claims of related, post-charge events." *Id.*

Thus, post-*Morgan*, this Court has continued to adhere to the rule "that the scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge," including claims that arise

after an EEOC charge and investigation. *Jones*, 551 F.3d at 302 (quoting *Nealon v. Stone*, 950 F.2d 584, 590 (4th Cir. 1992)); *see Sydnor*, 681 F.3d at 594. This reasoning aligns with exhaustion's underlying principles: that "it may be unfair, inefficient, or contrary to the purposes of [Title VII] to require a party to separately re-exhaust new violations that are 'reasonably related' to the initial claim." *Duplan v. City of New York*, 888 F.3d 612, 622 (2d Cir. 2018); *see Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 857 n.11 (7th Cir. 2019).

### C. MSU discriminated against Dr. Hollis based on sex when it failed to promote her to associate professor and full professor.

With the procedural objections out of the way, we now turn to the merits of Dr. Hollis's sex-discrimination claims. Title VII makes it unlawful for an employer "to discriminate against any individual … because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1).[7]

At summary judgment, Title VII claims generally proceed under the *McDonnell Douglas* proof framework, under which the plaintiff first seeks to establish a prima facie case of discrimination. *See Evans v. Techs. Applications*

---

[7] The Title VII analysis in this section applies to Dr. Hollis's sex-discrimination claims under the MFEPA and Title IX. "Because the [MFEPA] is the state law analogue of Title VII, interpretation of [MFEPA] claim[s] … [are] guided by federal cases interpreting Title VII." *Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 849 (D. Md. 2015). And this Court has held that "Title VII principles should be applied to Title IX actions, at least insofar as those actions raise employment discrimination claims." *Preston v. Virginia*, 31 F.3d 203, 206 (4th Cir. 1994). Thus, if this Court reverses on Dr. Hollis's Title VII sex-discrimination claim, it should reverse on her MFEPA and Title IX claims as well.

*& Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996). If she succeeds, the employer can "present a legitimate, non-discriminatory reason for its employment action." *Id.* If the employer does so, the burden then shifts back to the plaintiff to demonstrate that the defendant's reason is a pretext for discrimination. *Id.* This framework for proving discrimination with circumstantial evidence "recognizes 'that the question facing triers of fact in discrimination cases is both sensitive and difficult, and that there will seldom be eyewitness testimony as to the employer's mental processes.'" *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)).

Dr. Hollis established a prima facie case of sex discrimination, and MSU's reasons for rejecting her promotion applications are pretextual. Thus, a reasonable jury could find that Dr. Hollis was the victim of sex discrimination when MSU failed to promote her.

### 1.    Dr. Hollis established a prima facie case of sex discrimination.

In a failure-to-promote case, a plaintiff establishes a prima facie case of discrimination by showing that "(1) she is a member of a protected group, (2) she applied for the position in question, (3) she was qualified for that position, and (4) the defendants rejected her application under circumstances that give rise to an inference of unlawful discrimination." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005). The first two elements were not disputed below, *see* JA178-82: (1) Dr. Hollis

is a member of a protected group based on her sex, *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020); and (2) Dr. Hollis applied for associate professor with tenure in 2016 and full professor in 2019 and 2020, JA1875, 1877, 2895, 2900.

**Qualifications.** Dr. Hollis was qualified for these positions because she satisfies the position criteria "at least as well" as the men who were promoted. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 646 (4th Cir. 2002).

First, Dr. Hollis was qualified for associate professor with tenure in 2016. To qualify, a candidate must demonstrate "substantial professional achievement." JA199-200. Applicants are evaluated for teaching, research, and service. JA210-14. In 2016, at each level of review, Dr. Hollis received ratings of "excellent" and "satisfactory" in all but the research category. JA1132-33, 1879-80, 2111.

Dr. Hollis's research qualified her for promotion. Since joining MSU, Dr. Hollis published seven peer-reviewed articles. JA2906-07. MSU seemed to discredit five of these articles. As noted earlier (at 6), it criticized her for publishing three peer-reviewed articles in "pay-to-publish" journals and two in journals where she held membership on the editorial boards. *See, e.g.*, JA1133, 1898, 1911. Accepting MSU's criticisms for the moment, it apparently considered two of Dr. Hollis's articles as proof of outstanding research.

So, taking MSU at its word, Dr. Hollis was at least as qualified as Dr. Gaulee, who was promoted to associate professor with tenure when his relevant research portfolio contained only two "unaffiliated, non-pay-to-publish," peer-reviewed journal articles. JA2715-16. And, unlike Dr. Hollis, he had authored zero books between starting at MSU and applying for tenure. *Compare* JA2907, *with* JA2201-02. Dr. Hollis thus satisfied the "research" criteria—the only purported weak spot in her application, *see, e.g.*, JA1911—at least as well as Dr. Gaulee.

Next, Dr. Hollis was qualified for promotion to full professor in 2019 and 2020. According to the APT policy, to qualify for full professor, "[i]n addition to having the qualifications of an Associate Professor," an applicant "must have attained recognition as an outstanding scholar and instructor." JA200. These qualifications are measured under the APT policy's teaching, research, and service criteria. JA773-74.

Dr. Hollis satisfied the scholarship qualification for full professor at least as well as Dr. Robinson. Between receiving tenure (in 2014) and applying for full professor (in 2019), Dr. Robinson published zero books and only one journal article. JA2779, 2781, 2785, 2336. Moreover, Dr. Robinson did not publish any scholarship in the year he applied. JA2334-36. In contrast, Dr. Hollis published multiple peer-reviewed journal articles and a book chapter in 2019 alone, the same year she was granted tenure. JA1873, 2806, 2810. Another major criterion MSU uses to assess applicants' scholarship is grants. JA211, 213. Dr. Hollis received substantially more grant money in the

year she received tenure than Dr. Robinson received in his entire professional career. *Compare* JA2812, *with* JA2332. Dr. Hollis therefore satisfied the scholarship qualification for promotion to full professor at least as well as Dr. Robinson.

Dr. Hollis also satisfied the instruction qualification for full professor at least as well as Dr. Robinson. Dr. Hollis outperformed Dr. Robinson in student advising, "an essential and integral component of the instructional program" at MSU. JA210. She chaired four dissertations in 2019; Dr. Robinson chaired only six in his five tenured years. JA2822, 2341. On top of that, one of the dissertations Dr. Hollis chaired was awarded "Dissertation of the Year" in 2019. JA2811. Dr. Hollis therefore fulfilled the instruction qualification at least as well as Dr. Robinson.

**Inference of unlawful discrimination.** MSU rejected Dr. Hollis's promotion applications under circumstances that give rise to an inference of unlawful discrimination, thus satisfying the fourth element of Dr. Hollis's prima facie case. To establish this inference, Dr. Hollis need only show that the positions for which she applied were filled by male applicants. *See Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994). This showing eliminates any "inference of non-discrimination" that would be present had MSU promoted a woman. *See Miles v. Dell, Inc.*, 429 F.3d 480, 488 (4th Cir. 2005).

In 2019 and 2020, this inference is easily established. In both cycles, men in Dr. Hollis's department were promoted to full professor instead of her. JA1875, 1877. In fact, 100 percent of the men in the Department that applied

for full professor in 2019 and 2020 were promoted, while none of the female applicants in these years were promoted. JA1875, 1877. This "statistical evidence [is] 'unquestionably relevant'" and "may be used to establish an inference of discrimination." *Carter*, 33 F.3d at 456 (quoting *Ardrey v. UPS*, 798 F.2d 679, 684 (4th Cir. 1986)).

Although no other faculty members in Dr. Hollis's department applied for promotion in the 2016 cycle, JA1866-67, Dr. Hollis's 2016 promotion application was rejected under circumstances that give rise to an inference of unlawful discrimination based on Dr. Prime's derogatory comments. *See Miles*, 429 F.3d at 486-89 (holding a plaintiff need not always demonstrate a position was filled by persons outside the protected class to establish prima facie case of discrimination).

Dr. Prime's comments directly related to Dr. Hollis's promotion application and were facially sex-based: "Dr. Leah Hollis will never receive her tenure because she is a reject lesbian who will never receive her tenure while I maintain my office. … [M]y boys get the crown jewel, not a foul mouth reject lesbian, Dr. Hollis will never receive my blessing of any tenure at my University." JA1412. These were not "'stray or isolated' derogatory remarks." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 784 (4th Cir. 2023) (quoting *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 608 (4th Cir. 1999)). Instead, they bore directly on the decision to deny Dr. Hollis promotion because Dr. Prime stayed true to her word: She opposed

39

Dr. Hollis's promotion every time she had the chance, including during the 2016 promotion period. JA1132-33, 1959, 2025-26, 2071-72.[8]

Dr. Hollis thus "satisfied the 'relatively easy test' of showing that she, a qualified applicant, 'was rejected under circumstances which give rise to an inference of unlawful discrimination.'" *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (quoting *Young v. Lehman*, 748 F.2d 194, 197 (4th Cir. 1985)).

### 2. MSU's reasons for denying Dr. Hollis promotion are pretextual.

MSU articulated two reasons for denying Dr. Hollis's applications for promotion. First, MSU asserted that Dr. Hollis's 2016 promotion application was late. D. Ct. ECF 102 at 14. Second, MSU maintained that Dr. Hollis was denied promotion to full professor because the decision-makers at every level of review recommended against promotion. D. Ct. ECF 102 at 14-15.

Both reasons are pretextual. Dr. Hollis may prove pretext by "amassing circumstantial evidence that otherwise undermines the credibility of [MSU's] stated reasons." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 559 (4th Cir. 2011) (quoting *Heiko v. Colombo Sav. Bank*, 434 F.3d 249, 259 (4th Cir. 2006)). She does not need to introduce "*new* evidence, separate

---

[8] Although the district court rejected Dr. Prime's comments as "direct evidence" of discrimination, JA179, it never analyzed whether these comments constitute circumstantial evidence supporting an inference of unlawful discrimination under the *McDonnell Douglas* framework.

from her prima facie case" to demonstrate MSU's discriminatory motive. *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 727 (4th Cir. 2019). At the pretext stage of the *McDonnell Douglas* framework, undermining MSU's proffered reasons is sufficient because "it is *permissible*" for a jury "to infer the ultimate fact of discrimination from the falsity of [MSU's] explanation." *Westmoreland*, 924 F.3d at 727 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)). If Dr. Hollis puts forth "circumstantial evidence" showing that MSU's proffered justifications "are inconsistent over time, false, or based on mistakes of fact," then "the case must be decided by a trier of fact and cannot be resolved on summary judgment." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019).

**2016 failure to promote.** MSU's reason for denying Dr. Hollis's 2016 promotion application (that it was late) is pretextual because it is (1) inconsistent over time, (2) post-hoc, (3) the result of MSU's deviation from its own procedure, and (4) false.

MSU offered "different justifications at different times" for denying Dr. Hollis's 2016 application. *See EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852 (4th Cir. 2001). Dr. Hollis was first notified that her 2016 application was denied on May 26, 2017. JA1144-46. MSU did not indicate then that Dr. Hollis's application was being rejected for lateness, but instead claimed that Dr. Hollis did "not [meet] the criteria for promotion and tenure." JA1145. Later, after Dr. Hollis filed an EEOC charge, MSU told a different story, insisting that Dr. Hollis's application was "late" and so "not eligible

for consideration." JA1932; *see also infra* at 53-54. This Court has found similarly inconsistent and post-hoc rationales to be evidence of pretext. *See Sears*, 243 F.3d at 852-53 (different reasons "at different times" and "late appearance" of employer's current reason suggested pretext); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002) (employer's "inconsistent post-hoc explanations" were "probative of pretext").

MSU also failed to follow its own APT policy when reviewing Dr. Hollis's 2016 application. *See* JA181. Among these repeated departures from policy, Dean Welch recommended deferral before a school review committee even reviewed Dr. Hollis's application, JA2110-11, and Provost Gibson told Dr. Hollis she could not appeal until she received President Wilson's decision, JA1142. "Deviation from regular procedures is a classic example of evidence used to show pretext." *Johnson v. City of Charlotte*, 229 F. Supp. 2d 488, 495 (W.D.N.C. 2002); *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 205 (4th Cir. 2016).

MSU wrongly suggests that these procedural errors are not evidence of discrimination because "Dr. Hollis cannot identify any evidence that [MSU] did not honestly believe that her application was untimely." D. Ct. ECF 102 at 17. But *not even one* of the eleven MSU faculty members who reviewed Dr. Hollis's 2016 application noted that it was late, let alone that it should be rejected for that reason. *See* JA1140, 1145-46, 1879-80, 1882-85, 1887, 1889. Nor did the appeals committee. JA1928-30. A jury could doubt that MSU "honestly believed" Dr. Hollis's application was late because these decision-

makers "failed to reveal to anyone" MSU's "now-asserted reason" until after Dr. Hollis filed her EEOC complaint, a necessary precursor to this litigation. *See Sears*, 243 F.3d at 853-54.

Moreover, MSU's justification is false—Dr. Hollis's application was not late. As discussed above (at 8-9), Dr. Hollis's contract was effectively renewed for another three years, so she was free to apply for tenure and promotion to associate professor in fall 2016. That's what she did. JA2895, 2900. Given that Dr. Hollis's application was *not* late, a "trier of fact can reasonably infer from the falsity of [MSU's] explanation that [it] is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 134.

**2019 and 2020 failures to promote.** MSU claims it denied Dr. Hollis's promotions to full professor for the 2019 and 2020 applications because the decision-makers at every level of review recommended against promotion. But MSU cannot hide behind these decision-makers if they engaged in discriminatory decision-making. Employers are liable under Title VII for their agents' discrimination. *See* 42 U.S.C. § 2000e(b).[9]

And Dr. Hollis's application reviews reek of pretext. First, the decision-makers evaluated female and male candidates for full professor differently, which suggests pretext. *See Dennis*, 290 F.3d at 647. For instance, as part of

---

[9] To the extent MSU wants to claim these decision-makers were not "actual" decision-makers, *see Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288-89 (4th Cir. 2004), it undermines its own argument by claiming that these decision-makers were responsible for Dr. Hollis's application outcomes.

Dr. Hollis's 2019 departmental review, one reviewer evaluated her research on an explicitly gendered basis: "Among *full professors* in my discipline (social work), the average h-index for *women* is 17.73." JA2002 (emphasis added). In doing so, he held Dr. Hollis to a higher standard than male applicants for full professor, whose h-indexes he compared to the average h-index for *male associate professors* in the social-work discipline (10.27). JA2163, 2605. Later in 2020, this same reviewer compared Dr. Hollis's h-index to *female* associate professors' but still made the comparison on gendered terms. JA2054.

Other decision-makers, too, applied different metrics to Dr. Hollis and her male colleagues when evaluating teaching and research. For example, Dr. Prime (who had already proclaimed that she wanted Dr. Hollis to "leave … campus, very soon," JA1412) refused to recognize Dr. Hollis's favorable peer-teaching reviews because these reviews pre-dated her grant of tenure. JA2021, 2024. She thus rated Dr. Hollis's teaching as "unsatisfactory." JA2019. But Dr. Prime did not apply this purportedly nondiscriminatory reason when it came to rating Dr. Robinson's teaching as "excellent." JA2319-20. Dr. Prime recognized peer-teaching reviews of Dr. Robinson stretching back to 2013, before he was awarded tenure. JA2320. And on the same day in 2019, Dr. Prime recommended Dr. Robinson for promotion, but not Dr. Hollis. JA2025-26, 2326-27.

In the same vein, review committee members credited male full-professor candidates in 2020 for their in-progress research but failed to do the same for

44

Dr. Hollis. *Compare* JA2049, 2057, 2069, *with* JA2160, 2585, 2598, 2601-02. Given these examples of disparate evaluation, a reasonable jury could conclude that MSU decision-makers "never gave [Dr. Hollis] fair consideration because [they] had already decided for other reasons not to promote her, and that [their] proffered explanations for [their] choices were merely post-hoc pretexts covering a predisposition favoring" men. *Dennis*, 290 F.3d at 647.

Not only did MSU evaluate male and female candidates differently, its decision-makers promoted men in the Department to full professor even though Dr. Hollis's qualifications were "superior or at least equal." *Dennis*, 290 F.3d at 648. In 2019, when Drs. Hollis and Robinson applied for promotion, Dr. Hollis was at least as qualified as Dr. Robinson in each promotion criterion. In teaching, Dr. Hollis chaired a similar number of dissertations in substantially less time. *See supra* at 38. Regarding research, she published more scholarship and received more grant money. *See supra* at 37-38. And with respect to service, Drs. Hollis and Robinson received ratings of "satisfactory" from the departmental review committee, which along with the department chair, had primary responsibility for assessing candidates' service. JA213-14, 1984, 2315.

And, although reviewers dismissed Dr. Hollis's research, her scholarship was superior to Dr. Gaulee's in 2020, the year she and Dr. Gaulee both applied for full professor. Dr. Gaulee published two co-written, peer-reviewed articles and two book chapters in 2019, the year he and Dr. Hollis

45

received tenure. JA2201-02. On the other hand, Dr. Hollis published twelve peer-reviewed articles and one book chapter in the same year. JA2864-65, 2869. Nevertheless, Dr. Gaulee's research received ratings of "excellent" from the departmental and school committees, and he was promoted to full professor over Dr. Hollis. JA1877, 2182, 2184.

Dr. Hollis's evidence that she was better qualified than—or at least equally qualified to—Drs. Robinson and Gaulee is firmly rooted in MSU's promotion criteria. *Cf. Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005). The APT policy lists dissertations, peer-reviewed articles, and grants as relevant to assessing applicants' teaching and research. JA211-13. And the faculty members that reviewed the full-professor applications being compared here actually purported to use these metrics to assess applicants. *See* JA1887, 1984, 2054, 2182, 2184. Thus, in light of MSU's promotion criteria, MSU decision-makers' findings that Dr. Hollis was unqualified for promotion are "unworthy of credence." *Dennis*, 290 F.3d at 646 (quoting *Tex. Dept. of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)); *see Heiko v. Colombo Sav. Bank*, 434 F.3d 249, 259-62 (4th Cir. 2006).

Because Dr. Hollis's proof of pretext is grounded in MSU's own promotion criteria, it does not "ignore[] 'the inevitable element of subjectivity' involved in promotion decisions in the university setting." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 559 (4th Cir. 2011) (quoting *Smith v. Univ. of N.C.*, 632 F.2d 316, 342 (4th Cir. 1980)). Her pretext evidence thus avoids calling on this Court to "impose [its] judgment" as to

46

whether she should have been awarded promotion to full professor. *Smith*, 632 F.2d at 345. Dr. Hollis's qualifications create a genuine issue of fact regarding whether MSU denied her promotions because of discrimination, the ultimate question in any Title VII discrimination case. *See id.* at 345-46.

In answering this question, it should not matter that MSU is a university—academic freedom does not exempt universities from Title VII. *See Univ. of Pa. v. EEOC*, 493 U.S. 182, 199 (1990). Put otherwise, "[a]lthough the First Amendment grants a university certain freedoms, the freedom to discriminate is not among them." *Mawakana v. Bd. of Trs. of Univ. of the D.C.*, 926 F.3d 859, 866 (D.C. Cir. 2019). Thus, the district court's decision should be reversed because a reasonable jury could find—in light of MSU's evaluation process and proffered promotion criteria—that the decision-makers' reasons for rejecting Dr. Hollis's full-professor applications are pretextual.

## III. The district court erred in granting MSU summary judgment on Dr. Hollis's retaliation claims.

After MSU denied Dr. Hollis's 2016 promotion application, it retaliated against her. An employer unlawfully retaliates against an employee when it takes an adverse action against the employee because she engaged in protected activity. *See* 42 U.S.C. § 2000e-3(a); 20 U.S.C. § 1681; Md. Code Ann., State Gov't § 20-606(f); *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 56-57 (2006); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). In addition to the filing of a formal EEOC charge, protected activity includes

"communicat[ing] to [an] employer a belief that the employer has engaged in … discrimination," and "utilizing informal grievance procedures." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (citations omitted). An action is sufficiently adverse, and thus actionable retaliation, if it would "dissuade a reasonable worker" from engaging in protected activity. *Burlington*, 548 U.S. at 57. Here, immediately after finding out that Dr. Hollis filed an internal complaint and EEOC charge, MSU engaged in a retaliatory campaign against her, culminating in a materially adverse action: her demotion to at-will status. A reasonable jury could thus find MSU liable for retaliation.

### A. Dr. Hollis presented facts establishing a prima facie case of retaliation.

To establish a prima facie case of retaliation under Title VII, the plaintiff must show that (1) the employee engaged in a protected activity, (2) the employee suffered an adverse employment action, and (3) a causal nexus exists between the protected activity and the adverse employment action. *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015).[10]

Dr. Hollis met all three elements. MSU agrees that Dr. Hollis's claim satisfies the first two elements, *see* JA185-86: filing an EEO complaint and EEOC charge are protected activities, and demotion to at-will status is an

---

[10] Title IX and the MFEPA follow the same analysis as Title VII retaliation claims. *See Reid v. James Madison Univ.*, 90 F.4th 311, 319 (4th Cir. 2024); *Barreto v. SGT, Inc.*, 826 Fed. Appx. 267, 271 (4th Cir. 2020).

adverse employment action. *See DeMasters*, 796 F.3d at 422; *Burlington N. and Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006). Only the causation element is disputed.

Dr. Hollis has shown a causal nexus between her protected activity and her demotion, which is "not an onerous burden" at the prima facie stage. *Strothers v. City of Laurel*, 895 F.3d 317, 335 (4th Cir. 2018). This Court has "made abundantly clear that temporal proximity suffices to show a causal relationship." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 654 (4th Cir. 2021). To establish temporal proximity (and therefore causation), a plaintiff must show that the employer (1) "understood or should have understood" that the employee "engaged in a protected activity," and (2) took an adverse action against that employee "soon after becoming aware" of the activity. *Strothers*, 895 F.3d at 335-36. Even in the absence of temporal proximity between the protected activity and adverse action, a plaintiff can show causation when the intervening period includes other evidence of "recurring retaliatory animus" or conduct. *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).

First, MSU understood that Dr. Hollis engaged in a protected activity. Dr. Hollis filed an internal EEO complaint on September 8, 2017, and she filed her first EEOC charge that same month. JA1346-49, 1464. MSU's own records show that it knew about the EEOC charge that month. JA3009.

Second, Dr. Hollis's EEO complaint, EEOC charge, and demotion are causally connected, both because they are temporally proximate and because

MSU acted with retaliatory animus during the intervening three-month period. MSU took an adverse action against Dr. Hollis soon after it understood that she filed an EEOC complaint. Just three months later, on December 12, 2017, MSU demoted Dr. Hollis from a tenure-track assistant professor to an at-will employee. JA1934-35. Similarly proximate adverse actions have been sufficient to establish causation. *See, e.g.*, *Carter v. Ball*, 33 F.3d 450, 460, (4th Cir. 1994) (about four months between EEO complaint and demotion); *Silva v. Bowie State Univ.*, 2006 WL 314470, at *2 (4th Cir. 2006) (two-and-a-half months between EEO complaint and termination).

Moreover, "recurring retaliatory animus" bridged the small gap between the EEOC charge and MSU's retaliation. *Lettieri*, 478 F.3d at 650. Dr. Hollis's demotion was the culmination of a retaliatory campaign that began immediately after she filed her charge.

The campaign began in September 2017, the same month Dr. Hollis filed her complaint. JA1464. MSU's faculty appeals committee suddenly decided to review the appeal of Dr. Hollis's 2016 tenure denial that had been pending since May. JA1928. It recommended upholding Dr. Hollis's tenure denial. JA1928. This recommendation opened the door for Dr. Hollis to be converted to at-will status.

Next, in December 2017, President Wilson unexpectedly deemed Dr. Hollis's 2016 tenure application late. *See supra* at 8-9. During the fifteen-month review process, not one of the over a dozen reviewers reached this

(incorrect) conclusion. *See* JA1140, 1145-46, 1879-80, 1882-85, 1887, 1889, 1928-30.

Finally, that same day, Provost Gibson took the final step to punish Dr. Hollis for exercising her statutory rights: converting her into an at-will employee. JA1935. All told, MSU's months-long crusade against Dr. Hollis demonstrates a strong causal link between Dr. Hollis's protected activity and her demotion to at-will status.

### B. MSU's reasons for demoting Dr. Hollis are pretextual.

After the employee makes out a prima facie case of retaliation, she must show that the employer's purportedly non-discriminatory reasons are pretext for retaliation. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021). As discussed above (at 40-41), she can carry her burden by showing that the employer's justifications are false or have been inconsistent over time. *Id.* at 652.

First, MSU says that Dr. Hollis's contract expired because she failed to submit a timely first-year packet. But Dr. Hollis timely submitted this packet on April 9, 2015. JA916; *see* JA197-98. Provost Gibson also said that Dr. Hollis could not be renewed because Dr. Hollis never went through a required review process. JA1935. But the only reason that Dr. Hollis was not reviewed was because MSU failed to assemble a committee to do so. *See* JA2695. A jury may find that an employer's justifications are pretextual where, as here, it

penalized an employee for the consequences of the employer's own careless conduct. *See Sempowich*, 19 F.4th at 652.

At any rate, Dr. Hollis's contract did not expire. Dr. Hollis's first-term contract says that "[i]f the APPOINTEE is not to be continued beyond the initial three-year contract, the APPOINTEE is to be provided written notice by the end of the second year." JA2106. MSU never provided this notice. *See* JA905, 1930. In contrast with MSU's current assertions, Provost Gibson and the appeals committee said Dr. Hollis "should have" received a renewal letter for a second three-year term. JA1930. They also acted as though Dr. Hollis was renewed by scheduling her for classes beyond her third year. *See supra* at 8-9. Given these assurances, Dr. Hollis continued teaching beyond the term in her initial contract.

This continuation into her fourth year was not mere at-will employment. Dr. Hollis's employment contract does not mention at-will employment; either a professor is extended to a successive, three-year contract, or she is terminated. JA2106. MSU has not been able to point to any other instance when a tenure-track professor was demoted to at-will status. JA441.

Therefore, MSU's justification that Dr. Hollis was not renewed because she did not submit a timely packet is both false and inconsistent with its previous statements. This justification is false because Dr. Hollis submitted a timely first-year packet—the only reason it was not reviewed was because MSU failed to assemble a committee to do so. It is inconsistent because MSU previously offered *no* justification for failing to renew Dr. Hollis. MSU has

only recently decided to falsely blame Dr. Hollis for failing to submit a timely packet.

Second, MSU says that Dr. Hollis's contract nonrenewal rendered her 2016 tenure application late. To justify its demotion of Dr. Hollis, MSU needs this to be true—without a renewed three-year contract, MSU would be free to demote her to at-will status.

As discussed above (8-9), Dr. Hollis reasonably understood that she had been renewed for a second term. So, Dr. Hollis had until September of her fifth year to apply for promotion and tenure. JA199. Her 2016 application was therefore timely.

MSU's explanation for rejecting Dr. Hollis's 2016 promotion application also changed over time. MSU now claims that Dr. Hollis had to apply by September 2015. JA1934. But during the fifteen months MSU possessed Dr. Hollis's application, MSU never deemed the application late. Instead, as noted above (at 5-7), the reviewers analyzed her application on its merits. MSU decided that Dr. Hollis's promotion application was late only after Dr. Hollis filed her 2017 EEOC charge. JA1346, 1932. As outlined above, Dr. Hollis's 2016 promotion application had been reviewed by two faculty committees, the department chair, the dean, the provost, MSU's president, and an appeals committee—no one in this long process even suggested that Dr. Hollis's application was late. *See* JA1140, 1145-46, 1879-80, 1882-85, 1887, 1889, 1928-30.

In sum, substantial evidence indicates that both of MSU's proffered justifications are pretextual. Dr. Hollis's retaliation claim must be resolved by a jury.

## IV.    Dr. Hollis established a Section 1983 claim.

Intentional sex discrimination by persons acting under color of state law violates the Equal Protection Clause and is therefore actionable under Section 1983. *Wilcox v. Lyons*, 970 F.3d 452, 457-58 (4th Cir. 2020).

The elements of a prima facie case of intentional employment discrimination under Section 1983 and Title VII are the same. *See Causey v. Balog*, 162 F.3d 795, 804 (4th Cir. 1998). And the *McDonnell Douglas* framework has been used to evaluate employment-discrimination claims under both statutes. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004). Because Dr. Hollis demonstrated, under *McDonnell Douglas*, that a reasonable jury could find that she was a victim of sex discrimination in violation of Title VII, *see supra* at 34-47, defendants Wilson, Gibson, Prime, and Crumpton-Young could also be held liable for violating Dr. Hollis's rights under the Equal Protection Clause.

## Conclusion

This Court should reverse the district court's grant of summary judgment and remand for further proceedings on each of Dr. Hollis's claims.

Respectfully submitted,

/s/ Becca Steinberg

Viktor K. Dolberg                                       Becca Steinberg
Annie Farrell                                            Brian Wolfman
Zenia Grzebin                                           Regina Wang
  Student Counsel                                 GEORGETOWN LAW
                                                             APPELLATE COURTS IMMERSION CLINIC
Aderson B. Francois                                    600 New Jersey Ave., NW, Suite 312
GEORGETOWN LAW CIVIL RIGHTS              Washington, D.C. 20001
  CLINIC                                             (202) 662-5949

Counsel for Plaintiff-Appellant Leah P. Hollis

October 11, 2024

## Request for Oral Argument

Plaintiff-Appellant requests oral argument, which would significantly aid this Court's decisional process. This case involves a lengthy record and key disputes of material fact. Argument will allow the Court to investigate the relationship between the facts and the elements of Dr. Hollis's wage-discrimination, sex-discrimination, and retaliation claims. In addition, oral argument will help the Court in resolving uncertainty about the application of the exhaustion doctrine to claims that occur after the filing of an EEOC charge.

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,879 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(a)(1). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Palatino Linotype, a proportionally spaced typeface.

/s/ Becca Steinberg
Becca Steinberg

Counsel for Plaintiff-Appellant
Leah P. Hollis

October 11, 2024

**Certificate of Service**

I certify that on October 11, 2024, I electronically filed this Brief of Plaintiff-Appellant Leah P. Hollis using the CM/ECF System, which will send notice of the filing to the following registered CM/ECF user: counsel for Defendants-Appellees' Lillian Reynolds (lreynolds@oag.state.md.us).


/s/ Becca Steinberg

Becca Steinberg